## S09A2025. SHARP v. THE STATE.

(692 SE2d 325)

NAHMIAS, Justice.

Jeffrey Sharp appeals from his convictions for numerous crimes, including malice murder, arising from the death of Jessica Shultz.[1] Finding no merit to the many contentions Sharp raises, we affirm.

1. Shortly after midnight on August 19, 1997, City of Atlanta Police Officer Fenner and his partner saw a Pontiac Bonneville enter Roseland Cemetery. Because Officer Fenner knew the cemetery was frequently used for prostitution and for dropping off stolen cars, he followed the car into the cemetery, where he noticed that the Pontiac had turned around and was facing his police car. Officer Fenner shined his spotlight on the Pontiac, and the driver "froze for a few minutes." Officer Fenner testified that he could see the driver's face and that he got on his speaker system and told the driver to get out of the car. Instead, the driver fled in the Pontiac, and the officers engaged in a high speed chase.

The chase ended near Hendrix Elementary School in Clayton County, after the officers lost sight of the Pontiac. While the officers were parked, Officer Fenner saw a black male walking on the sidewalk who he thought looked like the driver of the Pontiac but was not sure. He got out of his car and asked the man where he lived. Officer Fenner testified that the man then turned his head, and the officer recognized the man as the driver of the Pontiac. At that point, the man fled on foot.

Officer Fenner chased the man but lost sight of him after he jumped a fence. By the time the foot chase ended, a separate patrol

---

[1] The crimes occurred on August 19, 1997. On May 5, 2000, Sharp was indicted for numerous crimes relating to the death of Shultz, including malice murder, four counts of felony murder (with rape, aggravated battery, aggravated sodomy, and kidnapping as the underlying felonies), rape, aggravated battery, aggravated sodomy, kidnapping with bodily injury, false imprisonment, fleeing and attempting to elude, and possession of a firearm by a convicted felon. In the same indictment, Sharp was also charged with several crimes against Sonya Fuller, including rape and false imprisonment, that were alleged to have occurred on August 16, 1997. On June 2, 2000, the State filed a notice of intent to seek the death penalty for the murder of Shultz. On November 19, 2002, a jury found Sharp guilty on all counts for the crimes against Shultz and acquitted him of the charges regarding Fuller. On November 21, 2002, the jury found the existence of statutory aggravating circumstances, but fixed Sharp's sentence as life without parole on the malice murder conviction. On December 11, 2002, the trial court sentenced Sharp to life without parole for the malice murder conviction. The felony murder convictions were vacated as a matter of law, and the trial court merged the aggravated battery and false imprisonment convictions with other convictions. The trial court sentenced Sharp to consecutive life sentences for rape and kidnapping with bodily injury and to consecutive terms in prison for the remaining convictions. On December 11, 2002, Sharp filed a motion for new trial, which he subsequently amended several times. On January 26, 2007, the trial court denied the motion for new trial, as amended. On February 19, 2007, Sharp filed a notice of appeal, and on August 19, 2009, the appeal was docketed in this Court. The case was orally argued on November 10, 2009.

unit had found the Pontiac behind the school. Officer Fenner retrieved the keys from the vehicle and searched the trunk, observing what appeared to be blood inside. It was later learned that the car was parked near Sharp's home. After seeing the blood, Officer Fenner radioed Officer Creasy, another Atlanta police officer, and told him to report to the cemetery to see if there was any evidence of criminal activity.

Officer Creasy went to the cemetery between 12:30 a.m. and 1:00 a.m. and found the nude victim, who worked as a prostitute, tied to a tree, dead. Her arms were tied behind the tree, and a stocking was tied around her neck. Fresh blood was coming from her mouth. She died from blunt head injuries and ligature strangulation. Forensic evidence showed that she had been raped and sodomized. A police investigator testified that the victim had only been dead a few hours.

Several condoms were found in the cemetery. Most were old and brittle, but one fresh condom, with bodily fluids inside, was discovered about 150 feet from the victim. The crime lab, however, lost that condom before Sharp was arrested and linked to the murder, so that the fluids could not be compared to Sharp's DNA.

The State introduced evidence that the Pontiac used in the crime was stolen from William Crabb at a gas station on August 15, 1997, less than four days before the murder. Crabb testified that, while he was inside the gas station paying for his gas, he looked outside and saw someone driving away in his car. Crabb ran outside, where another customer, Richard Allbright, let Crabb jump in his truck. The two men chased Crabb's car, but were unable to catch it. Before his car was stolen, Crabb was pumping gas and noticed a large black male walking in front of him. Later, Crabb picked Sharp out of a photographic lineup as the person he saw at the station, and he also identified Sharp as that man at trial. Crabb testified that his car had a handgun and a pair of binoculars in it when it was stolen.

Allbright described the person who stole Crabb's car as a large black man, with short hair and a round face. Allbright later viewed a photographic lineup, but was not able to positively identify anyone. He stated, however, that he was "drawn to one photograph," which was the photograph of Sharp.

Lisa Taylor, a witness at the gas station, testified that she saw a heavy-set black male driving the stolen vehicle. Taylor was unable to make a positive identification of the man from a photographic lineup, but she testified that a photo of Sharp "most resembled the person she saw that day." Taylor also made an in-court identification of Sharp as the man who stole Crabb's car.

About two months later, on October 16, 1997, Sharp was arrested for the burglary of a jewelry store in Forest Park. At the time of his arrest, Sharp was in possession of Crabb's handgun.

Several hours after the arrest, Officer Fenner went to the police station to view a photographic lineup. He picked Sharp's photograph from the lineup as the driver of the Pontiac and as the person he had seen on foot at the elementary school. Officer Fenner repeated that identification at trial.

Forensic evidence established that the blood in the trunk of the Pontiac was the victim's blood. A pair of binoculars, with the strap torn, was also found in the Pontiac. Terry Santamaria, a forensic analyst with the GBI, testified that a strap recovered from the victim's left wrist matched the torn strap on the binoculars. Police eventually found a spare tire cover with the same VIN as Crabb's Pontiac at a gas station near the cemetery, and blood on it matched the victim's blood. Semen from a used condom recovered near the tire cover matched Sharp's DNA.

Viewed in the light most favorable to the verdict, the evidence was sufficient for the jury rationally to have found Sharp guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307, 318-319 (99 SC 2781, 61 LE2d 560) (1979).

2. Sharp contends that the trial court erred in admitting evidence of crimes that he committed at the time of his arrest, including evidence of the armed robbery of the jewelry store and evidence that Sharp fired at the arresting officers. He also claims that the State exacerbated the error by discussing the arresting officer's testimony in the guilt-innocence phase closing argument.

Before the arresting officer testified, the State made a proffer of what it expected his testimony to be, and the testimony was consistent with that proffer. Sharp did not object to the introduction of the evidence either at the time of the proffer or during the officer's testimony. Sharp contends that his contention should still be evaluated under the plain error standard because the State sought the death penalty in this case. The plain error standard applies, however, only when a sentence of death is imposed. In those cases, it is our duty to "consider whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor," see OCGA § 17-10-35 (c), and in doing so, this Court will review, under the plain error standard, allegations of error that were not properly preserved. See *Gissendaner v. State*, 272 Ga. 704, 713-714 (532 SE2d 677) (2000). Accord *Walker v. State*, 282 Ga. 774, 777-778 (653 SE2d 439) (2007). Because the jury in this case imposed a sentence of life without parole, and Sharp did not object to the testimony, he is barred from raising this issue on appeal. See *Anderson v. State*, 286 Ga. 57, 58 (685 SE2d 716) (2009). In any event, the trial court did not abuse its discretion in admitting the testimony. See *Davis v. State*, 272 Ga. 327, 333-334 (528 SE2d 800) (2000) (upholding admission of

limited circumstances surrounding the defendant's arrest, including evidence the defendant's companion possessed marijuana and that the defendant was intoxicated, swore at the officers, and interfered with their arrest of his companion).

Sharp also did not object to the State's closing argument, and he is therefore procedurally barred from raising this issue as well. *Anderson*, 286 Ga. at 58. Because the prosecutor's argument was "derived from evidence properly before the factfinder," even if Sharp had objected to the argument, the trial court would not have abused its discretion in overruling it. *Williams v. State*, 279 Ga. 600, 602 (619 SE2d 649) (2005).

3. Sharp contends that he was deprived of a fair trial because the state crime lab lost the condom found 150 feet from the crime scene before the bodily fluids in it could be tested. Sharp contends that the condom was the only physical evidence with the potential to provide a direct link to the rape and murder of the victim, that DNA testing on it could have exonerated Sharp, that the condom constituted material exculpatory evidence, and that its loss amounted to a denial of due process. We disagree.

> In dealing with the failure of the state to preserve evidence which might have exonerated the defendant, a court must determine both whether the evidence was material and whether the police acted in bad faith in failing to preserve the evidence. *Arizona v. Youngblood*, 488 U. S. 51 (109 SC 333, 102 LE2d 281) (1988). To meet the standard of constitutional materiality, the evidence must possess an exculpatory value that was apparent before it was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *California v. Trombetta*, 467 U. S. 479 (104 SC 2528, 81 LE2d 413) (1984).

*Walker v. State*, 264 Ga. 676, 680 (449 SE2d 845) (1994). Accord *Ballard v. State*, 285 Ga. 15, 15-16 (673 SE2d 213) (2009).

Sharp has failed to show both that it was apparent that a condom found 150 feet from the crime scene, in a location frequented by prostitutes, would contain evidence of exculpatory value and that the State acted in bad faith in losing the condom, which occurred before Sharp was arrested and identified as a suspect. See *Hannah v. State*, 278 Ga. 195, 198 (599 SE2d 177) (2004) (because there was no evidence of bad faith in the State's failing to produce alleged exculpatory evidence, defendant's due process claim failed); *Dixon v. State*, 275 Ga. 232, 233 (564 SE2d 198) (2002) (defendant failed to "show that the evidence had any exculpatory value or that, if it did,

the custodians acted in bad faith by disposing of it"). Sharp's claim that his due process rights were violated by the loss of the condom is therefore meritless.

We also decline Sharp's invitation to adopt a rule requiring a finding of a due process violation any time possible exculpatory evidence is lost, without regard to constitutional materiality or bad faith. That rule would be a dramatic and unwarranted departure from the precedent of this Court and the United States Supreme Court.

4. Sharp contends that Officer Fenner's out-of-court identification of Sharp resulted from an impermissibly suggestive photographic lineup, which gave rise to a substantial likelihood of misidentification, and that the officer's in-court identification was tainted by the suggestive lineup and did not have an independent basis. We find no merit to these contentions.

If an out-of-court identification by a witness is so impermissibly suggestive that it could result in a substantial likelihood of misidentification, "evidence of that out-of-court identification violates due process and is inadmissible at trial." *State v. Hattney*, 279 Ga. 88, 89 (610 SE2d 44) (2005). An identification procedure is not impermissibly suggestive, however, "unless it 'leads the witness to (the virtually) inevitable identification of the defendant as the perpetrator, (and) is the equivalent of the authorities telling the witness, "This is our suspect."'" *Marshall v. State*, 285 Ga. 351, 352 (676 SE2d 201) (2009) (quoting *Padilla v. State*, 273 Ga. 553, 554 (544 SE2d 147) (2001)). And even if an out-of-court identification is impermissibly suggestive, a subsequent in-court identification is admissible if "it did not depend upon the prior identification[ ] but had an independent origin." *Humphrey v. State*, 281 Ga. 596, 597 (642 SE2d 23) (2007).

The photographs shown to Officer Fenner were of Sharp and five other males with similar characteristics and features. Moreover, "the record does not indicate any action by police that would have led the witnesses to single out [Sharp] in the photo lineup[ ]," and the fact that the photographs were booking photographs does not render them impermissibly suggestive. *Waters v. State*, 281 Ga. 119, 120 (636 SE2d 538) (2006). For these reasons, we find no merit to Sharp's contention that the out-of-court lineup was impermissibly suggestive. Because Sharp's challenge to the in-court identification depends upon his contention that the out-of-court identification was unlawful, that challenge also fails.

5. Sharp contends that the trial court erred when it denied his motion for mistrial after Officer Creasy, a State's witness, testified that, when he first saw the victim, "she was tied up to the tree. And it looked like she had been tortured." Sharp contends that the officer

improperly testified to the ultimate issue of whether the victim had been tortured. A mistrial, however, is "warranted only if essential to preserve a defendant's right to a fair trial, and the trial court is vested with broad discretion in making this determination." *Mister v. State*, 286 Ga. 303, 306 (3) (687 SE2d 471) (2009). Here, the trial court instructed the jury to disregard the testimony and informed the jurors that they had the duty to determine the facts in the case from the evidence and to draw whatever conclusions they chose from the evidence. Under the circumstances, the trial court did not abuse its discretion in denying the motion for mistrial. Id.

Sharp also contends that the State improperly emphasized Officer Creasy's improper testimony in its sentencing-phase closing argument. Sharp, however, is barred from raising the issue, as he did not object to the argument. *Anderson*, 286 Ga. at 58. Moreover, the record shows that the prosecutor did not mention the testimony of Officer Creasy to which Sharp had previously objected and was instead properly arguing a reasonable inference based on evidence that had been admitted. See *Allen v. State*, 277 Ga. 502, 503 (591 SE2d 784) (2004).

6. Contrary to Sharp's contention, the prosecutor did not improperly comment on Sharp's right to remain silent during closing argument at the sentencing phase, but instead properly argued Sharp's lack of remorse. See *Hammond v. State*, 264 Ga. 879, 886 (452 SE2d 745) (1995) ("defendant's lack of remorse is relevant to sentencing"); *Isaacs v. State*, 259 Ga. 717, 723 (386 SE2d 316) (1989) (same). In addition, because an argument about the lack of remorse is proper and because the trial court instructed the jury at the time of the objection to the prosecutor's argument that Sharp had "the absolute right to remain silent" and that "no inference may be drawn from the exercise of that right," the trial court clearly did not abuse its discretion in denying Sharp's motion for mistrial. See *Mister*, 286 Ga. at 306.

7. Sharp contends that the trial court erred in permitting Santamaria, the GBI forensic scientist, to testify that the strap found on the left wrist of the victim matched the strap on the binoculars found inside the Pontiac that Sharp had stolen from Crabb. We disagree. Santamaria testified that her examination was based on the laws of chemistry and physics, in particular the laws of force and separation, and that the type of examination at issue has been the subject of expert literature. Sharp presented no expert testimony or other evidence to undermine Santamaria's testimony, the theory it discussed, or the application of that theory in this case. The trial court therefore did not abuse its discretion in applying the analysis prescribed by *Harper v. State*, 249 Ga. 519, 525-526 (292 SE2d 389) (1982), and concluding that Santamaria's testimony was admissible.

See *Rivera v. State*, 282 Ga. 355, 358-359 (647 SE2d 70) (2007).

8. Sharp contends the trial court erred when it admitted three photographs of the victim's body tied to the tree in the cemetery. But the photographs were admissible to demonstrate the different injuries suffered by the victim. See *Sheppard v. State*, 285 Ga. 36, 37-38 (673 SE2d 852) (2009).

*Judgment affirmed. All the Justices concur.*

DECIDED MARCH 22, 2010.

*Buddy M. Mears, Carl P. Greenberg, Therese M. Day*, for appellant.

*Paul L. Howard, Jr., District Attorney, Bettieanne C. Hart, Lenny I. Krick, Anna G. Cross, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Sara K. Sahni, Assistant Attorney General*, for appellee.