306 Ga. 769
FINAL COPY

S19A0762.  REID v. THE STATE.

BETHEL, Justice.

Jameshia Reid appeals from the denial of her motion for new trial after a jury found her guilty of malice murder, felony murder, and cruelty to children in the first degree in connection with the death of her three-year-old son, Jakarie Reid.[1] On appeal, she argues that the evidence against her was insufficient to support the jury's verdicts, that the trial court erred by admitting a recording of an interview Reid gave to a DFCS investigator at the detective bureau,

---

[1] The crimes occurred on May 22, 2013. Reid was indicted by a Bibb County grand jury on August 13, 2013, for malice murder, felony murder, and cruelty to children in the first degree. At a jury trial held in January 2016, Reid was found guilty on all counts. She was sentenced to serve life in prison without parole for malice murder and a concurrent sentence of twenty years for cruelty to children. The trial court purported to merge the felony murder count into the malice murder count, but that count was vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993).

Reid filed a motion for new trial on January 29, 2016, and amended it through new counsel on December 4, 2018. After a hearing, the trial court denied the amended motion for new trial in an order dated December 7, 2018. Reid filed a notice of appeal on January 4, 2019. This case was docketed to the Court's April 2019 term and was submitted for a decision on the briefs.

and that the trial court erred by admitting a jail recording of a telephone conversation between Reid and her mother in which they discussed Reid's trial strategy. Finding no error, we affirm.

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. Reid and Latonya Sanders moved into a house in Macon with two of Reid's three children on Sunday, May 19, 2013. Reid's third child resided with Reid's mother in Warner Robins.

Reid and Sanders were both unemployed, and the house they moved into had no running water, no natural gas service, and no air conditioning. Reid and Sanders were out of money and had been pawning personal items to come up with cash in order to pay rent and activate utility service to the house. Adding to the stress of the move, their living conditions, and their financial situation, Reid had grown frustrated and impatient with her two young children and had become especially "tired of" potty-training her three-year-old son, Jakarie. On Tuesday, May 21, 2013, Jakarie had been particularly difficult, and Reid spanked him.

2

The following morning, Reid called Sanders to the kitchen after she found Jakarie with a bottle of acetone. Reid did not seem alarmed that Jakarie had the bottle, but Sanders took it from him and threw it across the room. Neither Reid nor Sanders immediately disciplined Jakarie, but later that morning Reid spanked Jakarie for playing with the acetone bottle and for taking some items out of the refrigerator. Sanders testified that Reid told Jakarie "not to pee on" himself. Sanders testified that while Reid spanked Jakarie, she was outside the house sitting on the front porch with her head in her hands. Sanders could hear Jakarie crying.

Several of Reid's neighbors testified that, at various times that morning, they could hear angry shouting from an adult female, the sounds of a child being struck, and the sounds of a child screaming and crying in pain. Several of the neighbors also saw Sanders sitting outside on the front porch, while they heard a woman inside the house yelling at and striking a young child, who was screaming. One of the neighbors testified that Sanders appeared to be worried and distraught.

Just before noon, Sanders was sitting on the front porch of the house making a phone call to a utility company when she heard a commotion in the back of the house. Reid called out to Sanders, and Sanders walked through the house and saw Jakarie unconscious in Reid's arms. Sanders immediately attempted to perform CPR, and she told Reid to call 911.

Reid called 911 and told the dispatcher that Jakarie's heart had stopped. Reid then took Jakarie from Sanders and continued CPR. Emergency response teams were dispatched and arrived at the home shortly thereafter. The law enforcement officers observed that Jakarie was unresponsive and took over CPR and called an ambulance. The officers also observed bruises and scratches on Jakarie's arms and chest. Reid spoke with officers at the house and indicated to them that Jakarie had consumed acetone before passing out in the home.[2]

---

[2] One officer testified that she did not smell acetone or any other chemical when she came into the house. She also noted that the bottles of acetone and other chemicals that she observed in the house had "childproof locks" on them.

Paramedics took Jakarie to a nearby hospital's pediatric intensive care unit, where he was examined by a pediatrician who specialized in examining children suspected of suffering from abuse. The pediatrician observed that Jakarie had suffered a forehead hematoma and had marks and bruises "everywhere" on his body. Several of the marks appeared to have been caused by a "loop shaped object." The pediatrician concluded that these marks and bruises were the result of "inflicted trauma" and recent child abuse. Jakarie also suffered retinal hemorrhaging and a subdural hematoma, the latter of which had caused blood to gather on his brain. The pediatrician was also concerned that Jakarie's liver and spleen were lacerated. The pediatrician testified that there was no evidence that Jakarie had ingested acetone and that none of his injuries were consistent with having resulted from an accident, as the result of playing with a dog, or from jumping rope, as Reid would later claim.

Following Jakarie's admission to the hospital, William Herndon, an investigator from the Division of Family and Children Services (DFCS) who was not a sworn law enforcement officer,

5

interviewed Reid at the hospital. A physician had notified Herndon's office that Jakarie had been hospitalized and that child abuse was a suspected cause of his injuries.

Just before speaking with Reid, Herndon observed Jakarie in the hospital's trauma bay and noted that he had "loop marks all about his abdomen" and that he had a "big knot" on his forehead. Herndon introduced himself to Reid and indicated that DFCS and law enforcement would be working the case "jointly." There were no law enforcement officers with Herndon at the time.

In her interview with Herndon at the hospital, Reid initially claimed that the contusions and abrasions on Jakarie's stomach were a result of Jakarie playing with the dog and playing jump rope the day before. She also indicated that she was solely responsible for disciplining Jakarie. Reid told Herndon that she had discovered Jakarie playing with acetone and other chemicals in the kitchen that morning, after which she took him outside, "popped" him on the forehead, and then sent him back inside. She said that she did not spank Jakarie. Reid then told Herndon that, after Jakarie went back

6

inside, he "fell." According to Reid, she then began performing CPR while Sanders called 911.

While Reid and Herndon were speaking at the hospital, they learned that Jakarie was being transferred to a children's hospital. Herndon stopped his interview with Reid at that time, left the hospital, and went back to his office. He saw Reid again later that afternoon at the Macon Police Department detective bureau, where he conducted a second interview with her.

During the interview at the detective bureau, Reid told Herndon that Jakarie suffered the knot on his head when he fell on the back porch after he ingested the acetone. Herndon noted that this contradicted her earlier statement to him in which she told him that Jakarie fell inside after Reid sent him in from the porch. She also told Herndon that she had "anger issues," and admitted to whipping Reid with a jump rope the day before he was taken to the hospital, although she maintained that some of Jakarie's injuries

7

occurred while playing with a dog.[3]

No detectives or law enforcement officers were present when Herndon interviewed Reid at the detective bureau. Recordings of Herndon's conversations with Reid at the hospital and detective bureau were played for the jury.

Jakarie later died, and his autopsy revealed that the cause of death was blunt force head trauma. He suffered multiple blunt force injuries, including bruises and abrasions to his torso, back, arms, and legs and internal injuries to his head. Each of those injuries had been suffered recently. The patterns of some of his injuries were consistent with a number of household objects that police removed from Reid's home. The injuries were not consistent with being the result of an accident, and there was no evidence that Jakarie had ingested acetone. Photographs taken during Jakarie's autopsy were presented to the jury.

On May 7, 2015, while awaiting trial, Reid phoned her mother

---

[3] Sanders testified that she and Reid had a puppy in the house that was very playful. She testified that Jakarie enjoyed playing with the puppy and that it had never scratched or injured him.

from jail and discussed her plan at the upcoming trial to blame Sanders as the person responsible for Jakarie's death. She also placed three other calls from jail that were recorded. Recordings of each of these calls were played for the jury.

At trial, Reid testified that she had not caused any of Jakarie's injuries and that she believed Sanders was responsible for Jakarie's death. Reid claimed she initially took sole responsibility for Jakarie's discipline and injuries out of fear that her children would be removed from her custody by DFCS.

Reid admitted that she continued to have a romantic relationship with Sanders after Jakarie's death. Sanders testified that she and Reid broke up later because Sanders could not support Reid financially while Reid was in jail. Sanders also testified that Reid had never blamed her for Jakarie's death or accused her of beating him.

The evidence, as summarized above, was sufficient to enable a rational trier of fact to find Reid guilty beyond a reasonable doubt of the crimes of which she was convicted. *Jackson v. Virginia*, 443 U.

S. 307 (99 SCt 2781, 61 LE2d 560) (1979). See also *Brown v. State*, 302 Ga. 454, 456 (1) (b) (807 SE2d 369) (2017) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citation and punctuation omitted)).

2. Reid argues that the trial court erred by admitting the recording of her interview with the DFCS investigator at the detective bureau. At trial, Reid objected to the State's use of the recording of that interview on the basis that it was a custodial interrogation which had not been preceded by the giving of the *Miranda* warnings,[4] or alternatively, that questioning continued after she had invoked her rights to remain silent and to counsel. The trial court overruled that objection, determining that because the interview at the detective bureau was conducted by a DFCS investigator with no law enforcement officers present, Reid was not in police custody at the time and no *Miranda* warnings were

---

[4] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

10

required. The trial court further found that Reid did not invoke her rights to silence and to counsel until she was interviewed by Detective Patterson, an interview which took place after the interview with Herndon at the detective bureau.

In addition to the arguments she raised at trial, Reid now argues that the trial court should have conducted a *Jackson-Denno*[5] hearing to determine whether, under the Fourteenth Amendment, the statements she made to the DFCS investigator at the detective bureau were made voluntarily. Reid further argues that because the DFCS investigator was interviewing her at the behest of law enforcement, her statements should not have been admitted, as they violated her Sixth Amendment right to counsel. Each of these arguments fails.

(a) A defendant who objects to the admission of her statements to the police is "entitled to a fair hearing in which both the underlying factual issues and the voluntariness of [her] confession

_____

[5] See *Jackson v. Denno*, 378 U. S. 368, 380 (84 SCt 1774, 12 LE2d 908) (1964).

are actually and reliably determined." *Jackson v. Denno*, 378 U. S. 368, 380 (84 SCt 1774, 12 LE2d 908) (1964). But "there is no constitutional requirement that the trial court conduct, sua sponte, a [*Jackson-Denno*] hearing on voluntariness absent a contemporaneous challenge to the use of the confession in evidence."*Hudson v. State*, 250 Ga. 479, 485 (6) (a) (299 SE2d 531) (1983) (citing *Wainwright v. Sykes*, 433 U. S. 72, 86 (97 SCt 2497, 53 LE2d 594) (1977)). See also *Speziali v. State*, 301 Ga. 290, 297-298 (800 SE2d 525) (2017) (same).

When the State moved to admit the recording of the detective-bureau interview, Reid objected, but this objection was limited to arguments that her statement was made while she was in custody and had been obtained either in the absence of *Miranda* warnings or after Reid invoked her rights to remain silent and to counsel. The record does not reflect any Fourteenth Amendment challenge to the voluntariness of Reid's statements given to the DFCS investigator at the detective bureau or any request that the trial court conduct a *Jackson-Denno* hearing.

As this Court discussed in *Watson v. State*, 227 Ga. 698, 699 (1) (182 SE2d 446) (1971), where a defendant objects to the use of a confession only on the "ground of the alleged failure to apprise the defendant of his constitutional rights prior to taking his statement," such objection "did not reach the issue of [the statement's] voluntariness." As we have more recently discussed,

> [c]oercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment. However, the investigators' mere failure to administer *Miranda* warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised. Thus, because the *Miranda* presumption does not necessarily constitute a finding that the statement was coerced, statements obtained in violation of the procedural requirements of *Miranda* may be found otherwise voluntary under due process standards.

(Citations and punctuation omitted.) *State v. Troutman*, 300 Ga. 616, 618 (2) (797 SE2d 72) (2017). See also *Brown v. State*, 294 Ga. 677, 679, 680 (755 SE2d 699) (2014) (noting that appellant moved to have custodial interview statements suppressed on the basis of separate violations of *Miranda* and of *Jackson v. Denno*), *Craver v.*

13

*State*, 246 Ga. 467, 468 (271 SE2d 862) (1980) (distinguishing voluntariness analysis under *Jackson-Denno* from custodial-interrogation analysis under *Miranda*), and *Dent v. State*, 243 Ga. 854, 854 (2) (257 SE2d 241) (1979) (same). Accordingly, because *Jackson-Denno* and *Miranda* provide distinct means for challenging the State's use of a confession, Reid's objection under *Miranda* was insufficient to challenge the voluntariness of the statements she made in her interview with the DFCS investigator at the detective bureau. To do so, Reid was required to make a specific objection to the admission of the statements on the basis of voluntariness or request a *Jackson-Denno* hearing. Because she did neither, and pretermitting whether Herndon's actions constituted "police" action under *Jackson-Denno*, the trial court did not err by failing to conduct such a hearing.

(b) Reid also takes issue with the trial court's determination that Reid was not in custody when she was interviewed by the DFCS investigator at the detective bureau and that no *Miranda* warnings were required. She also contends, as she did at trial, that she

continued to be interviewed after she invoked her rights to remain silent and to counsel and that any statements she made after that point should have been excluded. Both of these contentions are unavailing.

"In reviewing a ruling on the admissibility of a defendant's statements where the facts are disputed, we accept the trial court's factual findings and credibility determinations unless they are clearly erroneous, but we independently apply the law to the facts." (Citations and punctuation omitted.) *State v. Abbott*, 303 Ga. 297, 299 (1) (812 SE2d 225) (2018). In general,

> *Miranda* warnings are required when a person is (1) formally arrested or (2) restrained to the degree associated with a formal arrest. Unless a reasonable person in the suspect's situation would perceive that [s]he was in custody, *Miranda* warnings are not necessary.

(Citations and punctuation omitted.) *Freeman v. State*, 295 Ga. 820, 822-823 (764 SE2d 390) (2014). The decisive factor in this case is the point at which a reasonable person in Reid's situation would have perceived that she was in custody.

Other than briefly hearing arguments from counsel at trial

15

regarding Reid's objection to the admission of the recording of the interview which took place at the detective bureau, the trial court did not conduct a hearing regarding the circumstances of Reid's interviews with the DFCS investigator. However, during the hearing on Reid's motion for new trial, the trial court allowed Reid's appellate counsel to elicit testimony from Detective Patterson, the lead detective on the case, about the circumstances surrounding the interviews conducted by Investigator Herndon at the hospital and the detective bureau.

During the hearing, Detective Patterson testified that Reid went to the hospital with her mother after Jakarie was transported there via ambulance. Reid was interviewed by Investigator Herndon while at the hospital. Detective Patterson testified that Reid was not under arrest and that no detectives participated in the interview at the hospital.

Reid and her mother were transported to the detective bureau later in the afternoon by Investigator Herndon and another detective. Herndon again interviewed Reid at the detective bureau.

At that point, according to Patterson, Reid was still not under arrest, and no detectives participated in the interview. After the interview concluded, Reid returned to the hospital but later came back to the detective bureau because she wanted to speak with Detective Patterson. Upon her return, she met with Detective Patterson, who read her the *Miranda* warnings. According to Detective Patterson, this was the first time anyone had provided the *Miranda* warnings to Reid that day. Reid then invoked her rights to remain silent and to counsel, and Detective Patterson stopped questioning her. She was then placed under arrest.

The record thus belies Reid's contention that she was interrogated after receiving the *Miranda* warnings and invoking her rights to remain silent and to counsel. The record before us also supports the trial court's determination that Reid was not in custody at either time she spoke with the DFCS investigator. In its order denying Reid's motion for new trial, the trial court found that law enforcement officers had not been involved in either of the interviews conducted by the DFCS investigator and that the

17

interviews had been conducted before Reid was in police custody or arrested. The record before us supports each of these factual findings. Moreover, the record established that Reid remained free to leave the interviews with Herndon at any time and that she did so at the conclusion of each.

Based on the foregoing, we agree with the trial court's determination that Reid was not in custody or under arrest when she was interviewed by the DFCS investigator at the detective bureau. Moreover, no reasonable person in Reid's position would have considered herself to be restrained to such a degree that she would have perceived herself to be in custody when she was interviewed at the detective bureau. Therefore, because it was not incumbent upon the DFCS investigator to provide Reid with the *Miranda* warnings before interviewing her, Reid's statements in the interview conducted at the detective bureau were admissible. This enumeration of error fails.

(c) Finally, Reid argues that admission of the recording of her interview with the DFCS investigator at the detective bureau

violated her Sixth Amendment right to counsel, as articulated in *Massiah v. United States*, 377 U. S. 201 (84 SCt 1199, 12 LE2d 246) (1964), and *Brewer v. Williams*, 430 U. S. 387, 398 (97 SCt 1232, 51 LE2d 424) (1977). But as we have recently discussed, under *Massiah* and its progeny, "the Sixth Amendment right to counsel is violated by the admission of incriminating statements that a government agent deliberately elicits in the absence of counsel *after judicial proceedings have been initiated against the defendant*." (Citation omitted; emphasis supplied.) *Kemp v. State*, 303 Ga. 385, 390 (2) (a) (810 SE2d 515) (2018). "Before judicial proceedings are initiated[,] a suspect in a criminal investigation has no [Sixth Amendment] right to the assistance of counsel." (Citations and punctuation omitted.) *State v. Hatcher*, 264 Ga. 556, 558 (448 SE2d 698) (1994).

Here, Reid's DFCS interview at the detective bureau was conducted on May 22, 2013, the day Jakarie was transported to the hospital from Reid's house. Because no judicial proceedings had been initiated against Reid when that interview took place, there was no basis for excluding the contents of the interview under

19

*Massiah* and *Brewer*. This enumeration of error therefore fails.

3. Reid also argues that the trial court erred by admitting a recording of a telephone call Reid placed from jail to her mother in which the two discussed Reid's trial strategy to blame Sanders for Jakarie's death. At trial, Reid objected to the playing of this recording on the basis of attorney-client privilege, as it contained a discussion of trial strategy that Reid had previously had with her attorney. The trial court overruled this objection, finding that Reid's disclosure to her mother of the conversation she had previously had with her attorney waived attorney-client privilege as to that conversation. Reid now argues that she had no notice that the call would be recorded. She further argues that the State failed to lay a proper foundation for the recordings before introducing them, as no witness was asked to identify the speakers on the call or to testify that the equipment which recorded the call was working properly at the time. For the reasons discussed below, these enumerations fail.

(a) Reid first argues that she had no notice that the call she placed to her mother from jail would be recorded. However, a

20

technician from the Bibb County Sheriff's Office testified that, while there is nothing posted on the walls next to the phone indicating that calls are monitored, an inmate is made aware that his or her call is being recorded by an automated recording that comes on when he or she enters a personal identification number that allows him or her to access the phone. The technician testified that this recording is played at the beginning of each call. The standard introductory recording was played before the jury when the first of Reid's calls placed from jail was entered into evidence, and the parties agreed to waive further playing of the introductory recording when the remaining calls were played for the jury.

The record thus supports the trial court's conclusion that phone users, including Reid, were made aware that all calls placed by inmates from the jail would be recorded. Accordingly, this enumeration fails.

(b) Reid also contends that the trial court erred by not requiring the State to authenticate the recording of the call before playing it to the jury. As Reid made no objection on the basis of authentication

at trial, we review only for plain error. See OCGA § 24-1-103 (d).

> To show plain error, [Reid] must point to an error that was not affirmatively waived, the error must have been clear and not open to reasonable dispute, the error must have affected [her] substantial rights, and the error must have seriously affected the fairness, integrity or public reputation of judicial proceedings.

(Citation and punctuation omitted.) *Tyner v. State*, 305 Ga. 326, 331 (4) (825 SE2d 129) (2019).

> OCGA § 24-9-923 (c) provides, in pertinent part:

> [A]udio recordings produced at a time when the device producing the items was not being operated by an individual person or was not under the personal control or in the presence of an individual operator shall be admissible in evidence when the court determines, based on competent evidence presented to the court, that such items tend to show reliably the fact or facts for which the items are offered[.]

Here, prior to the admission of the recordings, a technician from the Bibb County Sheriff's Office testified that the jail used an automated system to record all calls placed by inmates other than calls placed to an attorney.[6] Such recordings were then stored on

---

[6] The technician's testimony established that the system could be configured so that calls placed by inmates to phone numbers associated with attorneys would not be recorded.

22

secure, off-site servers. The technician testified that inmates were required to enter a personal identification number into the automated phone system in order to place a call. The technician also identified compact discs containing audio recordings of the calls Reid placed to her mother from jail and indicated that they had been recorded at the time the calls were placed through the automated process described above. In light of this testimony, the trial court was authorized to determine that the recordings tended to show reliably the facts for which they were offered — namely, the contents of the calls placed by Reid to her mother from jail. See *Smith v. State*, 300 Ga. 538, 540 (2) (a) (796 SE2d 666) (2017) (no abuse of discretion in admitting recordings of jail calls over objection under OCGA § 24-9-923 (c) where, among other identifying information, the recordings contained the inmate number identifying the caller); *Jones v. State*, 299 Ga. 40, 45 (4) (785 SE2d 886) (2016) (no error in admitting recording of jail phone call where witness testified that jail's automated system accurately records phone calls, that the system recorded the defendant's calls at the time they were made, and that

23

defendant could be identified as the caller).  We therefore find no error — much less a plain error — on the part of the trial court in admitting these recordings.  This enumeration of error therefore fails.

*Judgment affirmed.  All the Justices concur.*

DECIDED SEPTEMBER 9, 2019.

Murder. Bibb Superior Court. Before Judge Simms.

*Jonathan P. Waters*, for appellant.

*K. David Cooke, Jr., District Attorney, Nancy S. Malcor, Shelley T. Milton, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Katherine D. Emerson, Assistant Attorney General*, for appellee.