308 Ga. 92
FINAL COPY

S19A1120.  WESTBROOK v. THE STATE.

WARREN, Justice.

Appellant Rickey Westbrook appeals from his convictions for malice murder and possession of a firearm during the commission of a felony stemming from the shooting death of Harry Wells.[1] Westbrook contends, among other things, that the trial court erred by denying his motion to suppress evidence recovered from his cell phone, by denying his motion to suppress a witness's identification of him during a photographic lineup, and by ruling that the

[1] Wells was killed on July 13, 2015.  On October 6, 2015, a DeKalb County grand jury indicted Westbrook for the malice murder of Wells, the felony murder of Wells predicated on aggravated assault, aggravated assault, and possession of a firearm during the commission of a felony.  On April 22, 2016, a jury found Westbrook guilty on all counts, and on May 18, 2016, the trial court sentenced Westbrook to life without parole for malice murder and to five consecutive years for the firearm offense.  The felony murder verdict was vacated by operation of law, and the aggravated assault count was merged into the malice murder conviction.  On June 13, 2016, Westbrook filed a motion for new trial, which he amended through new counsel on August 13, 2018.  On February 8, 2019, the trial court denied the motion for new trial, as amended. Westbrook filed a timely notice of appeal on March 7, 2019.  The case was docketed in this Court for the August 2019 term and submitted for a decision on the briefs.

recording of his call from jail to a friend was admissible. Concluding that Westbrook's contentions are without merit, we affirm.

1. Viewed in the light most favorable to the verdicts, the evidence showed that at around 4:00 a.m. on July 13, 2015, a man walked into a convenience store on Memorial Drive in DeKalb County and shot the store clerk, Harry Wells, in the abdomen, resulting in his death. Warren Mitchell was at the convenience store early that morning when a man walked by him, said that things were "about to get ugly," and walked in the store and shot Wells. Mitchell testified that the shooter was wearing dark pants and a short-sleeved shirt, was about 5′ 10″ tall, weighed about 190 pounds, and had dark skin, a teardrop tattoo under his left eye, and tattoos on his arms. Mitchell did not identify Westbrook, who had a teardrop tattoo under his right eye, in court, but he did identify him as the shooter in a pre-trial photographic lineup of six men. A video from the store's surveillance system showed that the shooter was wearing a hat, dark sweatpants with "emojis" on them, and a t-shirt with three letters on it, two of which were "BC."

2

On July 14, after receiving an anonymous tip, two detectives found Westbrook at the apartment in which he was living. Detective C. L. Brown testified that Westbrook told him that a friend of Westbrook's was letting him stay in the apartment. Believing that they did not then have probable cause to arrest Westbrook for murder, the detectives left the apartment and talked with a manager of the apartment complex, who told them that the apartment in which Westbrook was living was supposed to be vacant. A short time later, Westbrook left the apartment and was riding in a friend's car in the apartment complex, when — according to Detective Brown — he arrested Westbrook on the basis that he was engaged in criminal activity by occupying the apartment. Westbrook left his cell phone in his friend's car, and with the permission of Westbrook's friend, the detectives searched the car and seized Westbrook's phone.

After obtaining permission from apartment complex management, the detectives also searched the apartment in which Westbrook was living. There, they found a pair of black sweatpants

with yellow emojis on them and a dark shirt with the letters "BC" on the front of the shirt. Additionally, information extracted from Westbrook's cell phone pursuant to a search warrant showed that he had exchanged text messages with someone called "Sis" at 9:57 p.m. on the same day as Wells's early morning murder. The texts included one in which Westbrook told "Sis," "that hat in the trunk throw it away fast," and a response from "Sis," "Aight they got a pic of u." Westbrook's phone also showed that he had performed an internet search on the day of the crimes that resulted in a news update that said "clerk shot and killed in unincorporated Decatur slash Decatur Avondale Estates." Videos extracted from his cell phone contained an image of Westbrook wearing a hat like the one worn by the shooter and an image of someone other than Westbrook wearing emoji pants like those found in Westbrook's apartment.

At trial, an audio recording of a phone call that Westbrook made from jail to his friend, Xavier Cooper, was also admitted into evidence. During that call, Westbrook and Cooper discussed Westbrook shooting "up the hood," and Cooper told Westbrook that

4

the police had shown a photograph of Westbrook on the news. Cooper added that a video of the shooting had been played on the news and that Cooper recognized Westbrook in the video.

Westbrook does not challenge the sufficiency of the evidence. Nevertheless, consistent with this Court's general practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial was sufficient to authorize a rational jury to find beyond a reasonable doubt that Westbrook was guilty of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979).

2. Westbrook contends that the trial court erred by denying his pre-trial motion to suppress evidence. More specifically, he contends that the police did not have probable cause to believe that he was engaged in criminal activity by occupying the apartment in which he was living and that the evidence extracted from his cell phone should have been suppressed under the "fruit of the poisonous tree" doctrine as a result. See *Wong Sun v. United States*, 371 U.S. 471,

5

484-488 (83 SCt 407, 9 LE2d 441) (1963).[2] We conclude, however, that Westbrook's warrantless arrest was supported by probable cause and therefore was reasonable under the Fourth Amendment.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." U.S. Const. Amend. IV. "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (125 SCt 588, 160 LE2d 537) (2004). The United States Supreme Court

---

[2] We note that Westbrook's cell phone was seized from his friend's car after she consented to the search of her car at the time of Westbrook's arrest. The police later extracted evidence from the phone pursuant to a warrant. Westbrook made no argument below that the seizure of the phone pursuant to his friend's consent was invalid, and he does not raise this issue on appeal. We therefore do not consider it. See *Kennebrew v. State*, 304 Ga. 406, 408 n.2 (819 SE2d 37) (2018) (declining to address the issue whether the seizure of evidence pursuant to the consent of the defendant's roommate was valid because the defendant did not "appear to have preserved the argument below" and did not "include it in his enumerations of error"). Similarly, Westbrook makes no argument explaining how the "fruit of the poisonous tree" doctrine would lead to the exclusion of the evidence gathered from his cell phone pursuant to the warrant, and because we conclude that Westbrook's arrest was supported by probable cause, we need not address that issue here.

repeatedly has explained that "probable cause" to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.

*Michigan v. DeFillippo*, 443 U.S. 31, 37 (99 SCt 2627, 61 LE2d 343) (1979).

To determine whether an officer had probable cause for an arrest, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause. Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules. It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. Probable cause is not a high bar.

*District of Columbia v. Wesby*, ___ U.S. ___, ___ (138 SCt 577, 586, 199 LE2d 453) (2018) (citations and punctuation omitted).

"When reviewing the grant or denial of a motion to suppress, an appellate court must construe the evidentiary record in the light most favorable to the trial court's factual findings and judgment." *Caffee v. State*, 303 Ga. 557, 557 (814 SE2d 386) (2018). Moreover,

7

an appellate court "generally must accept [the trial court's factual] findings unless they are clearly erroneous," *Hughes v. State*, 296 Ga. 744, 746 (770 SE2d 636) (2015), and "also 'generally must limit its consideration of the disputed facts to those expressly found by the trial court.'" *Caffee*, 303 Ga. at 557 (quoting *Hughes*, 296 Ga. at 746). "Although we owe substantial deference to the way in which the trial court resolved disputed questions of material fact, we owe no deference at all to the trial court with respect to questions of law, and instead, we must apply the law ourselves to the material facts." *Hughes*, 296 Ga. at 750.

Here, the trial court found in its order that when police encountered Westbrook at the apartment in which he was living, his appearance matched the description of the murder suspect; that the officers were told by apartment management that the apartment was supposed to be vacant; and that Westbrook told the officers that he was temporarily staying in the apartment at the invitation of a friend. The court thus ruled that when the detectives detained Westbrook knowing these circumstances, they had probable cause

8

to arrest Westbrook for theft of services under OCGA § 16-8-5.[3]

Westbrook contends that his statement to the detectives that he was staying in the apartment as a guest could not form the basis for probable cause that he was committing the crime of theft of services. But we must accept the trial court's fact findings so long as they are not clearly erroneous, *Hughes*, 296 Ga. at 746, and we cannot say that the trial court's fact findings were clearly erroneous here.

In light of those findings, we have no trouble concluding that the police had probable cause to arrest Westbrook for theft of services. Critically, the detectives were told by apartment management that the apartment should have been vacant, such that discovering any person occupying that space suggested criminal activity. Considering the totality of the circumstances, the detectives were not required to accept as innocent Westbrook's

---

[3] OCGA § 16-8-5 provides that "[a] person commits the offense of theft of services when by deception and with the intent to avoid payment he knowingly obtains services, accommodations, entertainment, or the use of personal property which is available only for compensation."

9

explanation that a friend had given Westbrook permission to stay at the apartment. See *Wesby*, ___ U.S. at ___ (138 SCt at 588-589) (explaining that "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts," and that a suspect's innocent explanation should be viewed under the totality of the circumstances and not in isolation). For these reasons, we conclude that the trial court did not err when it ruled that the officers had probable cause to arrest Westbrook for theft of services, and that it therefore did not err when it denied Westbrook's motion to suppress.[4]

3. Westbrook contends that he was denied the effective

---

[4] Without making any argument on the point, Westbrook notes that the arresting officer testified at a pre-trial hearing that he intended to arrest Westbrook for criminal trespass, not for theft of services. However, it is clear that

> an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause. See *Whren v. United States*, 517 U.S. 806, 812-813 (116 SCt 1769, 135 LE2d 89) (1996) (reviewing cases); *Arkansas v. Sullivan*, 532 U.S. 769 (121 SCt 1876, 149 LE2d 994) (2001) (per curiam). That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.

*Devenpeck*, 543 U.S. at 153.

assistance of counsel in two respects. We find no merit to his claims.

To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984); *Wesley v. State*, 286 Ga. 355, 356 (689 SE2d 280) (2010). To satisfy the deficiency prong, a defendant must demonstrate that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (745 SE2d 637) (2013); see also *Strickland*, 466 U.S. at 687-688. To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. *Strickland*, 466 U.S. at 694. "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Lawrence v. State*, 286 Ga. 533, 533-534 (690 SE2d 801) (2010).

(a)     Westbrook argues that his trial counsel provided constitutionally ineffective assistance by failing to object to the warrant authorizing a search of his cell phone on the ground that the phrase "electronic data," which described the things to be seized on his phone, was not specific enough to include the photos and videos police recovered from his phone.[5] We conclude, however, that trial counsel did not perform deficiently in failing to raise that objection.

"In evaluating the particularity of a warrant's description, we must determine whether the description is sufficient to enable a prudent officer executing the warrant to locate it definitely and with reasonable certainty." *Hourin v. State*, 301 Ga. 835, 844 (804 SE2d 388) (2017) (citation and punctuation omitted). Moreover, the "degree of the description's specificity is flexible and will vary with the circumstances involved." Id. (citation and punctuation omitted).

---

[5] The search warrant described the things to be seized as "Phone identification data, Phone number assigned to the unit, Address book, Incoming and outgoing call logs, Incoming and outgoing SMS text logs," and "Electronic data." The warrant also limited the scope of the search to evidence pertaining to the commission of the murder.

Here, contrary to Westbrook's contention, the use of the phrase "electronic data" was specific enough to enable a prudent officer to know to look for photographs and videos stored on Westbrook's cell phone. See *Hawkins v. State,* 290 Ga. 785, 786 (723 SE2d 924) (2012) (noting that a cell phone is an "electronic device" that can be searched for "electronic data" and describing the types of data that can be discovered as including emails, text messages, and photographs), abrogated on other grounds by *Riley v. California,* ___ U.S. 373 (134 SCt 2473, 189 LE2d 430) (2014). Because an objection to the particularity of the warrant would have been meritless, trial counsel did not perform deficiently by failing to object. See *Ivey v. State,* 305 Ga. 156, 162 (824 SE2d 242) (2019). His claim of ineffective assistance of counsel therefore fails.

(b) Westbrook next argues that his trial counsel provided constitutionally ineffective assistance when, at trial, he did not object to the text message "Sis" sent to his cell phone being admitted into evidence. Specifically, Westbrook argues that trial counsel should have objected on the ground that the text message was

13

inadmissible hearsay.

It is true that Westbrook's counsel did not object to this evidence on hearsay grounds, but even assuming that the incoming message from "Sis" was inadmissible hearsay, see *Glispie v. State*, 300 Ga. 128, 131 (793 SE2d 381) (2016) (holding that incoming text messages to the defendant's cell phone were not admissible as an admission by a party opponent), Westbrook cannot show prejudice on this claim. It is unclear whether "Sis," by use of the word "pic," was referring to a photograph of Westbrook or to the surveillance video, but, in any event, the text message was cumulative of other evidence that was properly admitted at trial. See *Smith v. State*, 307 Ga. 106, 115 (834 SE2d 750) (2019) (holding that the defendants could not show prejudice from the admission of certain out-of-court statements because they were "merely cumulative of other properly admissible evidence"). His claim of ineffective assistance of counsel therefore fails.

4. Westbrook contends that the trial court erred by failing to suppress Warren Mitchell's pre-trial identification of him on the

14

ground that the lineup procedure was impermissibly suggestive and gave rise to a substantial likelihood of misidentification. We disagree.

"If an out-of-court identification by a witness is so impermissibly suggestive that it could result in a substantial likelihood of misidentification, 'evidence of that out-of-court identification violates due process and is inadmissible at trial.'" *Sharp v. State*, 286 Ga. 799, 803 (692 SE2d 325) (2010) (citation and punctuation omitted). However, "[a]n identification procedure is not impermissibly suggestive . . . unless it leads the witness to the virtually inevitable identification of the defendant as the perpetrator, and is the equivalent of the authorities telling the witness, 'This is our suspect.'" Id. (citation and punctuation omitted). Finally, "[w]here the identification procedure is not unduly suggestive, it is not necessary to consider whether there was a substantial likelihood of irreparable misidentification." *Mosley v. State*, 307 Ga. 711, 721 (838 SE2d 289) (2020) (citation and punctuation omitted). We review a trial court's determination that

15

a lineup was not impermissibly suggestive for an abuse of discretion. See *Jordan v. State*, 303 Ga. 709, 712 (814 SE2d 682) (2018).

Here, within several days of the crimes, Mitchell was shown a photographic lineup of six black males with similar hairstyles, with several of the males having a skin tone similar to Westbrook's and all of the males having similar, short facial hair. In addition, because Westbrook had a tattoo on his forehead and a teardrop tattoo under his right eye, the police superimposed on each of the six photographs a dark spot in those two places. The investigating officer read Mitchell the standard admonition that the photographs "may or may not contain a picture of the person who committed the crime," that he should take his time and "study the photographs carefully," and that he should not "allow [him]self to be influenced by any police officer." The officer also informed Mitchell that he should consider the lighting of the photographs and how it "might affect the complexion of some persons, making them appear lighter or darker," as well as the fact that "hair styles, facial hair, scars, marks, etc. can be easily changed, added, or taken away." These

16

considerations support the trial court's conclusion that the photographic lineup was not impermissibly suggestive. See *Bowen v. State*, 299 Ga. 875, 879 (792 SE2d 691) (2016) (holding that a photographic lineup was not impermissibly suggestive because the lineup consisted of photographs of black males with similar hairstyles and a police officer read the standard admonition to the witness and did not threaten the witness or suggest a certain picture).

Westbrook correctly notes that his photograph showed him with two small piercings by each eye, whereas no other person's photograph had that feature. But Mitchell had not included that characteristic in the description of the shooter he gave to police and, in fact, told police at the lineup that he had not seen piercings on the shooter at the time of the shooting. Even so, he still identified Westbrook from the lineup as the shooter. This consideration, coupled with the admonition that Mitchell should not give too much weight to changeable facial features, also supports the conclusion that the lineup was not impermissibly suggestive.

17

Viewed as a whole, and especially considering that the six lineup photographs were substantially similar, we cannot say that the lineup led Mitchell "to the virtually inevitable identification of [Westbrook] as the perpetrator"; it was not "the equivalent of the authorities telling [Mitchell], 'This is our suspect.'" *Sharp*, 286 Ga. at 803 (citation and punctuation omitted). See also 2 Wayne R. LaFave et al., Criminal Procedure § 7.4 (e) (4th ed. Dec. 2019 update) (suggesting that when a suspect has an unusual characteristic that "*was included*" in a witness's earlier description to the police, it would be desirable for that characteristic "to be either concealed or duplicated by other members of the lineup" (emphasis supplied)). The trial court therefore did not abuse its discretion when it denied Westbrook's motion to suppress. See *Jordan*, 303 Ga. at 712.

5. Westbrook contends that the trial court erred by admitting into evidence the audio recording of the phone call that Westbrook made from jail to Cooper. We disagree.

To begin, we note that the parties do not dispute that, when

18

Cooper and Westbrook discussed a "picture" and a "video" during the call, they were referring to Westbrook's picture taken at the time of his arrest and the store's surveillance video of the shooting. With that explanation in mind, the audio recording shows that between three and four minutes into the call, Cooper and Westbrook talked about Westbrook shooting "up the hood," saying that Westbrook "had the hood on crazy mode." Westbrook asked Cooper what "they showed" and "what picture did they have up there." Cooper responded by saying, "man you got some nappy hair." Approximately ten minutes later into the call, Cooper told Westbrook that "everybody know [about the shooting]. The whole hood know . . . you on the news dude." Westbrook then asked if "[t]hey show the video." Cooper said that people were talking about the video and that he had not seen "everything that's goin' on." But he added, "that's all I need to see right there that's my n*****'s face, I know that face." Westbrook laughed, and Cooper repeated that he "kn[e]w that face." Westbrook then said, "Damn man." The trial court ruled that the recording of the phone call was properly

19

authenticated and that the substance of the call was admissible as an adoptive admission.

(a) Westbrook contends that the audio recording was not properly authenticated. We disagree.

Because Westbrook did not object to the alleged lack of authentication at trial, we review his claim only for plain error. See OCGA § 24-1-103 (d). To establish plain error, Westbrook must show, among other things, that the trial court committed a "clear and obvious [error] beyond reasonable dispute." *Castillo-Velasquez v. State*, 305 Ga. 644, 653 (827 SE2d 257) (2019) (citation and punctuation omitted). The record shows that the trial court did not commit any error, much less a "clear and obvious" error.

OCGA § 24-9-923 (c) ("Rule 923"), provides, in relevant part:

[A]udio recordings produced at a time when the device producing the items was not being operated by an individual person or was not under the personal control or in the presence of an individual operator shall be admissible in evidence when the court determines, based on competent evidence presented to the court, that such items tend to show reliably the fact or facts for which the items are offered[.]

20

Here, before the recordings were admitted, a major with the DeKalb County Sheriff's Office testified that he was the administrator for the automated system that the county used to record phone calls placed by inmates at the jail; that the system automatically records all calls made by inmates; that the inmates have to use a personal identification number to place a call through the system; and that all calls are stored for 180 days by the technology company that runs the system. The State also offered evidence that the recording introduced into evidence was placed through the jail's recording system with Westbrook using his personal identification number to place the call, and that Westbrook identified himself by name at the beginning of the call.

Based on this evidence, "the trial court was authorized to determine that the recordings tended to show reliably the facts for which they were offered — namely, the contents of the calls" Westbrook made to Cooper from jail. *Reid v. State*, 306 Ga. 769, 778-779 (833 SE2d 100) (2019) (holding that, under circumstances similar to these, including the use of an automated system to record

21

all calls placed by inmates, the trial court did not abuse its discretion in admitting an audio recording of a jail call under Rule 923 (c)). Accord *Smith v. State*, 300 Ga. 538, 540 (796 SE2d 666) (2017) (same). Westbrook's enumeration of error therefore fails.

(b) Westbrook contends that the trial court abused its discretion in admitting the audio recording as an adoptive admission. We again disagree.

In our current Evidence Code, OCGA § 24-8-801 governs the admission of evidence as adoptive admissions. We have recently explained that our Rule 801 "is materially identical to Federal Rule of Evidence 801" and that we therefore "look for guidance to federal case law applying the federal rule." *State v. Orr*, 305 Ga. 729, 740 (827 SE2d 892) (2019). In *Orr*, we also explained that

> [o]ur Rule 801 (a) (2) defines a "[s]tatement" to include the "[n]onverbal conduct of a person, if it is intended by the person as an assertion," and Rule 801 (d) (2) (B) then defines "admissions" not excluded by the hearsay rule when offered against a party to include "[a] statement of which the party has manifested an adoption or belief in its truth." For evidence to qualify as a criminal defendant's adoptive admission under Rule 801 (d) (2) (B), the trial court must find that two criteria were met: first,

that "'the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond,'" and second, that "'there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement.'" *United States v. Jenkins*, 779 F2d 606, 612 (11th Cir. 1986) (citation omitted).

*Orr*, 305 Ga. at 740. See also *Wilkins v. State*, 308 Ga. __, __ (__ SE2d __) (2020).

Westbrook contends that when Cooper responded to Westbrook's question whether people were talking about the video and said that he had not seen "everything that's goin' on," it meant that Cooper had not seen the video and that, therefore, when Cooper said, "that's all I need to see right there that's my n*****'s face, I know that face," he had to be referring to the photograph of Westbrook that Cooper and Westbrook had discussed earlier in the phone call, and not the surveillance video. According to Westbrook, he would have no reason to deny that it was him in the photograph, so the phone call was not admissible as an adoptive admission that he was depicted in the video.

But the context of the phone call shows otherwise. Indeed,

23

Westbrook and Cooper's conversation about the photograph preceded the discussion about the video by some 10 minutes, and just before Cooper's statement that he recognized Westbrook, Cooper told Westbrook that Westbrook was "on the news," prompting Westbrook to ask if "[t]hey show[ed] the video." It was only at that point that Cooper said three times that he recognized Westbrook's face.

Based on this evidence, the trial court was authorized to conclude that Cooper was implicating Westbrook in the shooting of the victim by saying that he recognized him in the video of the shooting. Likewise, the trial court was authorized to find "the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond," and that "there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement." *Orr*, 305 Ga. at 740 (citation and punctuation omitted). Accord *United States v. Carter*, 760 F2d 1568, 1579-1580 (11th Cir. 1985) (holding that the trial court properly determined that statements of

24

a co-conspirator implicating the defendants in the crimes were admissible as adoptive admissions because the defendants remained silent when the statements were made in their presence).

(c) Westbrook contends that the admission of the jail recording violated his constitutional right of confrontation because he did not have the right to confront Cooper about his statements. But because Westbrook did not raise this issue below, we review it only for plain error. Here, there was no error, plain or otherwise. "The admission of an out-of-court statement into evidence at a criminal trial comes within the scope of the Confrontation Clause only if the statement was 'testimonial.'" *Reed v. State*, 307 Ga. 527, ___ (837 SE2d 272) (2019) (citation and punctuation omitted). And "[a] statement is testimonial if its primary purpose was to establish evidence for use in a future prosecution." Id. (citation and punctuation omitted). It is clear that the primary purpose of Cooper's statement that he recognized Westbrook in the surveillance video, which was prompted by Westbrook's own question whether the police had shown the video, was not "to establish evidence for use in a future

25

prosecution."  Westbrook's contention therefore fails.

*Judgment affirmed.  All the Justices concur.*

DECIDED FEBRUARY 28, 2020.
Murder. DeKalb Superior Court. Before Judge Adams.
*Michael W. Tarleton*, for appellant.
*Sherry Boston, District Attorney, Emily K. Richardson, Elizabeth H. Brock, Destiny H. Bryant, Assistant District Attorneys;*

*Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General*, for appellee. *Clare M. Gilbert, Alexis Agathocleous*, amici curiae.