NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: May 3, 2022

S22A0251. HARRIS v. THE STATE.

PETERSON, Justice.

Jordan Robert Harris appeals his convictions for felony murder and other charges stemming from the July 2010 shooting of Walter Phelps during the robbery of Phelps's store; Phelps died from blood clots over a month after the shooting.[1] Harris argues that the

---

[1] Phelps was shot on July 3, 2010. On October 27, 2010, a Dougherty County grand jury indicted Harris along with five other defendants. The indictment charged Harris with two counts of felony murder (predicated on armed robbery and aggravated assault), armed robbery, three counts of aggravated assault (committed against Phelps, Teresa Fletcher, and Carl Terrell), conspiracy to commit armed robbery, conspiracy to commit felony murder, three counts of possession of a firearm during the commission of a felony, and financial transaction card fraud. Along with co-defendant Ezekiel James, Harris was tried before a jury in August 2014. The jury found Harris guilty on all charged counts. On January 7, 2015, the trial court sentenced Harris to serve life in prison for felony murder (predicated on armed robbery), 20-year prison sentences for the two counts of aggravated assault committed against Fletcher and Terrell (concurrent with the life sentence), consecutive five-year sentences for each of the three firearms counts (concurrent with one

evidence presented at his trial was insufficient to support his convictions and that the trial court erred by admitting other-acts evidence, unreliable identifications of him, evidence marred by violations of *Brady*[2] and Georgia's criminal discovery statute, and inadmissible hearsay. We conclude that the evidence was sufficient and the trial court did not abuse its discretion in admitting the identification or other-acts evidence. We conclude that any error in the admission of the alleged hearsay was harmless. And we conclude that Harris has not shown a *Brady* violation and waived any claim of error under the discovery statute. We therefore affirm.

The evidence presented at trial showed that Phelps owned the P&P Garden Center in Dougherty County. On July 3, 2010, Phelps arrived at the store around 7:00 a.m. to prepare for its opening. Shortly after Phelps arrived, a man came into the store, wearing a

---

another), and a concurrent three-year sentence for the credit card fraud count. The other counts merged or were vacated by operation of law. Harris filed a motion for new trial on January 15, 2015; the motion was amended by appellate counsel on June 30, 2020. The trial court denied the motion in an order entered on March 18, 2021. Harris filed a timely notice of appeal and the case was docketed to this Court's term beginning in December 2021 and submitted for consideration on the briefs.

[2] *Brady v. Maryland*, 373 U.S. 83 (83 SCt 1194, 10 LE2d 215) (1963).

2

hoodie and keeping his hand in his pockets. The man asked for work, then left. At around 7:35 a.m., Phelps's friend Mercer Garrett came by, and Phelps, who seemed rattled, reported that he had just been visited by a man who had asked for work and seemed suspicious. Garrett left after a few minutes. The suspicious man returned, shot Phelps, then asked where the store's money was kept.

An employee of the store, Teresa Fletcher, arrived at about 7:45 a.m. and found Phelps lying on the floor with a gunshot wound. A man pointed a gun at Fletcher and then at other employees who subsequently arrived — Carl Terrell and Ryan Richardson[3] — as the man attempted to find the store's cash. The man, whom Fletcher later identified as Harris, demanded that the employees empty their pockets. Interrupted by additional store employees, Harris grabbed the cash register, placed it in a bag, and left with the bag and Phelps's keys and wallet.

When EMTs arrived, they found Phelps in poor condition,

---

[3] Richardson was among those indicted along with Harris for felony murder and other offenses. Richardson pleaded guilty to various counts prior to Harris's trial but did not testify at that trial.

bleeding profusely. Phelps was only semi-conscious when transported to a hospital. He gave a statement to an investigator at the hospital on the day of the shooting, as well as on July 13; both statements were recorded and played for the jury. In the second statement, Phelps described the suspicious man who had entered the store, left, then returned and shot him. Phelps described the shooter as a light-skinned black male in his late teens or early twenties, around six feet tall, and weighing 160 to 180 pounds. Phelps was shown photo lineups that did not include Harris; Phelps did not identify anyone as the shooter, although he said one person looked familiar.

The doctor who treated Phelps in the emergency room described his gunshot wounds as life-threatening. She said that Phelps appeared to be otherwise healthy and showed no signs of blood clots. After surgery, Phelps was assigned an ICU bed; the doctor who cared for him there noted no history of blood clots. Phelps was released from the hospital on July 24, 2010. Although he was ambulatory while at home, he remained on oxygen and had physical

limitations. Phelps returned to the hospital on August 7, 2010, and died that same day.

The medical examiner who performed Phelps's autopsy testified that Phelps's death was caused by blood clots that resulted from the gunshot wound to Phelps's torso. She testified that two of the three primary risk factors for blood clots — immobility and physical trauma — were present as a result of the Phelps's gunshot wound. She ruled out other possible causes of clots, including Phelps's genetics, age, weight, smoking history, heart issues, and other health history.

In addition to Fletcher's out-of-court and in-court identification of Harris, he also was implicated in the shooting by co-defendant Jamon Carter, who pleaded guilty to related charges prior to the trial of Harris and co-defendant Ezekiel James.[4] Carter testified at Harris's trial that in late June 2010, Harris discussed plans to "do a lick" at the P&P store to get some money to purchase clothing at a

---

[4] The jury found James guilty of financial transaction card fraud but not guilty of the other charges against him.

Polo outlet store, with James serving as the driver. Carter testified that he, Harris, James, and another man went to the Polo store on July 3, the day of the shooting, and Harris paid for items selected by each of the men with a credit card. Carter identified Harris in a surveillance video recording from the Polo store. Carter also testified to conversations with James after the surveillance video was aired on the news in which James said, "we was on the news," and wondered aloud "why [Harris] shot the man."

As detailed further in Division 3, the State also introduced evidence of three prior armed robberies of convenience stores committed by Harris.

1. Harris argues that the evidence is insufficient to support his convictions for three reasons. We disagree.

When evaluating the sufficiency of evidence as a matter of constitutional due process, we must determine whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). In making that determination, "we view

6

the evidence in the light most favorable to the verdict, and we put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the [jury]." *Wilkerson v. State*, 307 Ga. 574, 574 (837 SE2d 300) (2019) (citation and punctuation omitted). "As long as there is some competent evidence, even if contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld." *Scott v. State*, 309 Ga. 764, 766 (1) (848 SE2d 448) (2020) (citation and punctuation omitted).

(a) First, Harris argues that the evidence presented at trial was insufficient to sustain his convictions generally because the State failed to prove that he was the person who shot Phelps. In support of this argument, he argues that Fletcher's pretrial and in-person identifications of him never should have been admitted because, as discussed in more detail in Division 2, the identifications allegedly were unreliable and the product of impermissibly suggestive procedures. But "in reviewing the sufficiency of the evidence, we consider all of the evidence admitted by the trial court,

7

regardless of whether that evidence was admitted erroneously." *Chavers v. State*, 304 Ga. 887, 892 (2) n.4 (823 SE2d 283) (2019) (citation and punctuation omitted). Harris also argues that this Court "should weigh Ms. Fletcher's credibility and her inconsistent statements against the State." But as noted above, that was a matter for the jury. The State presented ample evidence, including the testimony of Carter and Fletcher, for the jury to conclude that Harris shot Phelps.

(b)    Harris next argues that the evidence was insufficient to sustain his felony murder conviction because the State did not prove a nexus between the shooting and Phelps's death from blood clots. We disagree. A person commits felony murder when, "in the commission of a felony, he or she causes the death of another human being irrespective of malice." OCGA § 16-5-1 (c). "The element of causation is determined under the proximate cause standard." *Campbell-Williams v. State*, 309 Ga. 585, 587 (2) (a) (847 SE2d 583) (2020). "Proximate causation imposes liability for the reasonably foreseeable results of criminal conduct if there is no sufficient,

8

independent, and unforeseen intervening cause." *Treadaway v. State*, 308 Ga. 882, 884 (1) (843 SE2d 784) (2020) (citation and punctuation omitted).

> An unlawful injury is the proximate cause of death when: (1) the injury itself constituted the sole proximate cause of death; or (2) the injury directly and materially contributed to the happening of a subsequent accruing immediate cause of death; or (3) the injury materially accelerated the death, although proximately occasioned by a pre-existing cause.

Id. (citation omitted).

Here, the evidence showed that Phelps developed blood clots only after Harris shot him in the torso. The doctor who treated Phelps's life-threatening wounds stated that Phelps appeared to be otherwise healthy and showed no signs of blood clots. The medical examiner testified that Phelps's death was caused by blood clots resulting from his gunshot wound. She ruled out possible causes of clots unrelated to the shooting, such as weight and health history. Moreover, "[w]hether [Harris]'s actions were the sole cause of [Phelps]'s death or would have otherwise caused his death under different circumstances is immaterial." *Treadaway*, 308 Ga. at 885

9

(1). "[T]he offender takes [his] victim as [he] finds him." Id. (citation and punctuation omitted). The State thus provided the jury with sufficient evidence to conclude that the shooting was the proximate cause of Phelps's death. See *Eberhart v. State*, 307 Ga. 254, 261-262 (2) (a) (835 SE2d 192) (2019) (evidence sufficient to uphold defendant's felony murder conviction predicated on aggravated assault where medical examiner testified that the victim died from hypertensive cardiovascular disease exacerbated by physical exertion and application of TASER by defendant); *Bryant v. State*, 270 Ga. 266, 268-269 (1) (a) (507 SE2d 451) (1998) (evidence sufficient to sustain felony murder convictions notwithstanding that gunshot victim who suffered blood clot previously suffered from some conditions that might have put her at risk for a clot).

(c)   In his final challenge to the sufficiency of the evidence, Harris argues that the evidence was insufficient to sustain his conviction for the aggravated assault of Terrell and the associated firearm conviction. The aggravated assault count at issue charged Harris with assaulting Terrell "with intent to rob by pointing a

handgun, a firearm, and a deadly weapon . . . at Carl Terrell and demanding United States currency and/or valuables[.]" Harris claims that the evidence was insufficient to support his conviction on this count because there was no testimony that Harris attempted or intended to rob Terrell. The count at issue required the State to prove not only that Harris had assaulted Terrell, but that he did so with the intent to rob. See *Thomas v. State*, 292 Ga. 429, 433 (4) (738 SE2d 571) (2013). But although Terrell testified that he did not see anyone other than Richardson during the robbery and that the gunman did not ask for any wallet or money or threaten to harm him, Fletcher testified that Harris told "everyone," which necessarily includes Terrell, to take what they had out of their pockets. The testimony of a single witness is generally sufficient to prove a fact. See OCGA § 24-14-8.[5] And again, conflicts in the evidence are for the jury to resolve. The jury was authorized to

---

[5] The jury also heard testimony that the gunman sought money belonging to the store as Terrell lay on the floor. But given Fletcher's testimony that Harris told "everyone" to empty their pockets, we need not consider whether Harris's intent to rob the store was sufficient to satisfy the intent-to-rob element as to the aggravated assault of Terrell.

conclude that Harris assaulted Terrell with an intent to rob.

2.    Harris next argues that the trial court erred in admitting Fletcher's pretrial and in-court identifications of him. He contends that this violated his due process rights because the pretrial identification procedure was unreliable and Fletcher's in-court identification was tainted by it. We disagree.

More than two months after the shooting, Fletcher was shown a photo lineup in which she identified Harris's photo as that of the store robber. Harris filed a motion to suppress the pretrial, and any in-court, identification by Fletcher. The investigator who conducted the lineup with Fletcher testified at a pretrial hearing that in selecting photos, he used software that suggested pictures based on Harris's height and weight. He testified that he selected five photos from those suggestions and that all were of persons of the same race and gender as Harris, with similar facial characteristics. The investigator testified that his procedure in conducting a lineup is to tell the witness to be careful, take as much time as necessary, and look at each photo individually. He testified that he told Fletcher

that the perpetrator may or may not be in the lineup. In her testimony, Fletcher did not seem to recall this final admonition, but she did remember that the investigator did not indicate who the police suspected was the perpetrator.

The trial court summarily denied the motion to suppress. Following a recess in the middle of Fletcher's trial testimony, Harris made a renewed objection to her pretrial identification; the trial court gave Harris a continuing objection.

Harris first argues that the pretrial lineup was impermissibly suggestive. "If an out-of-court identification by a witness is so impermissibly suggestive that it could result in a substantial likelihood of misidentification, evidence of that out-of-court identification violates due process and is inadmissible at trial." *Westbrook v. State*, 308 Ga. 92, 99 (4) (839 SE2d 620) (2020) (citation and punctuation omitted). An identification procedure is impermissibly suggestive when "it leads the witness to the virtually inevitable identification of the defendant as the perpetrator, and is the equivalent of the authorities telling the witness, 'This is our

suspect.'" Id. (citation and punctuation omitted). "We review a trial court's determination that a lineup was not impermissibly suggestive for an abuse of discretion." Id.

In arguing that the lineup was impermissibly suggestive, Harris first notes that he was the only person in the lineup whom Fletcher had seen previously. But Fletcher testified at the hearing that she had stopped watching news about the shooting and did not recall identifying anyone in the Polo outlet surveillance video that she was shown.[6] Cf. *Kirkland v. State*, 310 Ga. 738, 742-743 (2) (c) (854 SE2d 508) (2021) (rejecting argument based on the witness's having been shown a photograph of the defendant by a neighborhood friend prior to his police interview because this had no bearing on whether the police's conduct was unduly suggestive and the witness testified that he could not remember whose picture the friend had shown him).

Harris next argues that the lineup procedure was

---

[6] Fletcher testified at trial that the recording that she was shown out of court was too blurry for her to recognize anyone.

impermissibly suggestive because the officer who conducted the lineup knew that Harris was the suspect. Citing a psychology journal article, Harris argues that this was particularly problematic because the officer did not "take precautions" to ensure that he did not provide "conscious or unconscious cues" that Harris was the suspect. But Harris does not specify what the officer should have done differently, except to the extent that he argues that a photo lineup must be presented by someone who does not know the suspect's identity. "There is no authority supporting [such an] argument. To the contrary, statutory law contemplates photo lineups being administered by police officers who know the identity of a suspect." *Kirkland*, 310 Ga. at 741 (2) (a).[7] The evidence

---

[7] *Kirkland* cites OCGA § 17-20-2 (b) (2) (B) for this proposition. This statute says that law enforcement agency lineup policies should provide that where the officer conducting the lineup knows the identity of the suspect, photographs should be "placed in folders, randomly shuffled, and then presented to the witness so that the individual conducting such procedure cannot physically see which photograph is being viewed by the witness until the procedure is complete[.]" Harris does not specifically allege a violation of this statute, and the investigator testified at the hearing that after he gave Fletcher various admonishments, he "just handed her the lineup and let her look at it." In any case, any violation of the statute does not automatically require exclusion; rather, it is just one factor a court may consider when an

15

supports the trial court's implicit conclusion that the lineup was not impermissibly suggestive. See *Westbrook*, 308 Ga. at 99 (4) (evidence supported the trial court's conclusion that photographic lineup was not impermissibly suggestive where lineup consisted of photographs of six men of the same race and with similar hairstyles and short facial hair, investigators superimposed marks similar to defendant's tattoos on each of the photos, and investigator gave witness various standard admonitions); *Bowen v. State*, 299 Ga. 875, 879 (4) (792 SE2d 691) (2016) (holding that photographic lineup was not impermissibly suggestive where lineup consisted of photographs of six men of the same race and similar hairstyles, and witnesses were read the standard admonition and not threatened or told which picture to choose).

Harris also argues that Fletcher's pretrial identification of him should have been excluded because there is a substantial likelihood of misidentification for other reasons, such as the stressful nature of

identification is challenged. See *Kirkland*, 310 Ga. at 741-742 (2) (a) (citing OCGA § 17-20-3).

Fletcher's interaction with the gunman and her inconsistent descriptions of him.[8] But "where the identification procedure is not unduly suggestive, it is not necessary to consider whether there was a substantial likelihood of irreparable misidentification." *Westbrook*, 308 Ga. at 99 (4) (citation and punctuation omitted). We see no abuse of discretion in the trial court's admission of Fletcher's pretrial identification of Harris. And because Harris's argument that Fletcher's in-court identification was improper depends on his claim that her pretrial identification was fatally flawed, it fails as well.

3. Harris next argues that the trial court erred by admitting certain other-acts evidence. We conclude that the trial court did not abuse its discretion.

The other acts involved robberies of two different convenience stores in Dougherty County (for which Harris had been convicted in

---

[8] Fletcher gave a general description of the gunman to a 911 operator, describing the person as a black male and giving varying possible heights for the gunman — 6'4", 6'5", 6'8", and 6'9". She later estimated his height at 5'6", 5'8", or 5'9", said he weighed about 165 pounds, and said that she could not remember any particular facial feature, such as facial hair, of the gunman. Jail records show Harris's height as 5'9" and his weight as 185 pounds.

a 2011 trial) and a robbery of a convenience store in Lee County (for which Harris previously had entered a guilty plea). Harris objected to the admission of the evidence on the grounds that it was not admissible for a proper purpose and any legitimate probative value was outweighed by its prejudice. In a pretrial order, the trial court ruled that the other-acts evidence was admissible under OCGA § 24-4-404 (b) ("Rule 404 (b)") to show motive, opportunity, plan, knowledge, and intent. At trial, the State presented witness testimony regarding the Lee County robbery and one of the Dougherty County robberies. The State was permitted to read the prior testimony of a witness to the other Dougherty County robbery. It also introduced certified copies of Harris's convictions stemming from the three robberies, all of which took place on February 26, 2009. The trial court gave limiting instructions to the jury both when the other-acts evidence was introduced and in its final charge.

We review the trial court's decision to admit evidence pursuant to Rule 404 (b) for abuse of discretion. See *Jackson v. State*, 306 Ga. 69, 76 (2) (b) (829 SE2d 142) (2019). Other-acts evidence is not

18

admissible "to prove the character of a person in order to show action in conformity therewith." OCGA § 24-4-404 (b). Nevertheless, such evidence is admissible for other purposes, including "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Id. A party offering evidence pursuant to Rule 404 (b) must demonstrate that: (1) it is relevant to an issue in the case other than the defendant's character; (2) its probative value is not substantially outweighed by the danger of unfair prejudice it poses; and (3) sufficient proof exists for a jury to find by a preponderance of the evidence that the defendant committed the other act. See *Kirby v. State*, 304 Ga. 472, 479 (4) (819 SE2d 468) (2018).

On appeal, Harris addresses only the first prong of that test, arguing that the other-acts evidence was not relevant for a proper purpose. We disagree. "Because [Harris] entered a plea of not guilty, [he] made intent a material issue, and the State may prove intent by qualifying Rule 404 (b) evidence absent affirmative steps by the defendant to remove intent as an issue." *Hood v. State*, 309 Ga. 493,

499-500 (2) (847 SE2d 172) (2020). Harris has pointed to no step he took to remove intent as an issue. Several charged offenses in this case — felony murder predicated on armed robbery, armed robbery, and aggravated assault with intent to rob — required the State to prove that Harris had the intent to rob. See *Johnson v. Williams*, 304 Ga. 771, 773 (822 SE2d 264) (2018) (armed robbery and aggravated assault with intent to rob both require proof of intent to rob). Each of the three other acts resulted in an armed robbery conviction which, again, required proof of intent to rob. Therefore, the other-acts evidence was relevant to intent, which is a proper purpose.

Harris does not challenge the admission of the other-acts evidence on any other basis, including whether its probative value (which may have been limited, given ample other evidence of intent) was outweighed by the danger of unfair prejudice. Accordingly, Harris has not shown that the trial court abused its direction in determining that the evidence was admissible under Rule 404 (b). And although the other-acts evidence was also admitted for

20

purposes other than intent, Harris disputes only the admission of the evidence; he makes no claim that, notwithstanding its admission for intent, he was harmed by the trial court's instruction that the evidence could also be used for other purposes. This claim fails.

4. Harris argues that the trial court erred in admitting two instances of hearsay, one of them part of the other-acts evidence: (1) the State's reading of testimony from his prior armed robbery trial, and (2) Phelps's statements to Garrett.[9] We conclude that any error in this regard was harmless.

(a) At the trial in this case, the State presented to the court testimony regarding its unsuccessful efforts to locate a witness, Angela Hunter, who had testified in Harris's prior trial for the February 2009 robberies in Dougherty County. Over a defense objection, the trial court admitted Hunter's prior testimony under OCGA § 24-8-804 (b) (1), and the State was permitted to read that prior testimony to the jury, including objections and cross-

---

[9] Harris makes reference to "the confrontation clause" in his enumerations of error but makes no actual argument apart from Georgia's Evidence Code.

examination.

OCGA § 24-8-804 (b) (1) provides that "[t]estimony given as a witness at another hearing of the same or a different proceeding" may be admissible "if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." The parties argue about whether Harris's motive to develop Hunter's testimony was similar in the prior proceeding and his trial in this case, but even if this issue was preserved,[10] we need not resolve the parties' dispute.

> It is fundamental that harm as well as error must be shown for reversal. The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict. In determining whether trial court error was harmless, we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict.

*Henderson v. State*, 310 Ga. 708, 713 (3) (854 SE2d 523) (2021)

---

[10] It is unclear whether the defense objected to this testimony on hearsay grounds; the defense argued in objection to Hunter's testimony that *none* of the other-acts evidence should have been admitted.

(citations and punctuation omitted); see also OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . ."). Any error in the admission of Hunter's testimony was harmless, as it is highly probable that it did not contribute to the verdicts. The jury had already heard evidence of two other similar robberies. The trial court had admitted certified copies of Harris's convictions stemming not only from those robberies, but also the one that was the subject of Hunter's testimony. Other evidence against Harris included Fletcher's pretrial and in-court identifications of him as the gunman in the robbery in this case. Little marginal harm arose from the admission of Hunter's prior testimony, and any error therein does not provide a basis for reversal. See *Kirby*, 304 Ga. at 487 (4) (c) (concluding that improper admission of prior violent act was harmless where other Rule 404 (b) evidence of violent crimes was admitted along with compelling evidence of defendant's guilt).

(b) Harris also argues that the trial court erred in admitting

23

Garrett's testimony as to Phelps's statement to him about the suspicious man who had come into the store the morning of the shooting. Again, we conclude that any error in this regard was harmless.

Garrett testified to Phelps's statement over a hearsay and Confrontation Clause objection by Harris. The trial court ruled that the testimony was admissible under the present sense impression exception to the hearsay rule. See OCGA § 24-8-803 (1). Harris argues that the State did not provide a sufficient foundation that Phelps's statements to Garrett about a suspicious individual were sufficiently contemporaneous with that encounter to overcome his hearsay objection. The State responds that the evidence was admissible as a present sense impression or, alternatively, as an excited utterance excluded from the hearsay rule under OCGA § 24-8-803 (2).

We need not resolve that issue, as it is highly probable that Garrett's testimony about what Phelps said to him did not contribute to the verdict. Garrett testified that Phelps's statement

24

described the suspicious man merely as "a black male" with "a hood on"; this did not implicate Harris in any particular way. The jury also heard both of Phelps's recorded statements to an investigator in which Phelps described in greater detail the suspicious individual who later returned and shot him, and Harris does not challenge the admission of those statements in this appeal. Any error in the admission of Phelps's statement to Garrett is not a reason to reverse.[11]

5.  Harris argues that he was denied due process under *Brady* because the State somehow thwarted his access to a plea allocution by co-defendant Carter. We disagree.

At a pretrial hearing, Carter's attorney testified that she recalled that Carter had pleaded guilty to charges related to Phelps's death in November 2012. There also was some indication — in the

---

[11] Harris does not explicitly argue that his convictions should be reversed due to any cumulative prejudice of multiple trial court errors. See *State v. Lane*, 308 Ga. 10, 18 (1) (838 SE2d 808) (2020) ("[E]ven in the evidentiary context, a defendant who wishes to take advantage of the [cumulative-error] rule that we adopt today should explain to the reviewing court just how he was prejudiced by the cumulative effect of multiple errors."). We nonetheless have considered the cumulative effect of the admission of Hunter's prior testimony and Phelps's statement to Garrett and see no reason to reverse.

form of a news media article attached as an exhibit to a defense motion — that a prosecutor referenced a guilty plea by Carter in a news media interview in January 2013. But apparently, no transcript of any November 2012 guilty plea by Carter could be located by the parties or the court.[12] In June 2014, Harris filed a motion to exclude Carter's testimony, arguing that the State's failure to notify Harris of the terms of Carter's negotiations and to preserve transcripts and other court documents relating to Carter's 2012 plea and allocution amounted to a *Brady* violation. The trial court denied the motion, deeming it "unlikely" that the plea hearing had taken place, given the lack of documentation of such a hearing. The court also concluded that any failure to ensure that documents were properly maintained and preserved was not the prosecutor's fault, but that of the judge, court staff, or the court reporter.

Under *Brady* and *Giglio v. United States*, 405 U.S. 150 (92 SCt 763, 31 LE2d 104) (1972), "the State violates due process when it

---

[12] Regardless of whether Carter had entered such a plea in November 2012, it is clear that he did so in the same case on May 5, 2014.

suppresses evidence that materially undermines witness credibility." *Thomas v. State*, 311 Ga. 706, 711 (1) (a) (859 SE2d 14) (2021) (citation and punctuation omitted). To prevail on such a claim, a defendant must show that

> (1) the State possessed evidence favorable to his defense; (2) he did not possess the favorable evidence and could not obtain it himself with any reasonable diligence; (3) the State suppressed the favorable evidence; and (4) had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the trial would have been different.

Id. at 711-712 (1) (a) (citation and punctuation omitted). The burden of proof on these elements lies with the defendant. See *State v. Hill*, 295 Ga. 716, 720 (763 SE2d 675) (2014). We review a trial court's factual findings regarding a *Brady* claim for clear error but review the court's application of the law to the facts de novo. See *State v. Thomas*, 311 Ga. 407, 414 (3) (a) (858 SE2d 52) (2021).

Here, Harris has failed to show that the State possessed evidence favorable to the defense, let alone that the State suppressed such evidence. The trial court deemed it unlikely that Carter made a plea allocution in November 2012. We cannot

27

conclude on this record that this finding was clearly erroneous. The State could not possess, let alone suppress, records that do not exist. See *Brannon v. State*, 298 Ga. 601, 605 (3) (a) (783 SE2d 642) (2016) ("Although appellant disputes the trial court's finding that the type of notes he sought to compel did not exist, mere speculation is insufficient to substantiate appellant's claim that the State withheld exculpatory evidence which prejudiced his defense."). And the trial court at least implicitly found that in the unlikely event that the plea hearing did take place, the records were lost by court staff. "*Brady* requires information to be revealed only when it is possessed by the prosecutor or anyone over whom the prosecutor has authority." *Zant v. Moon*, 264 Ga. 93, 100 (3) (440 SE2d 657) (1994) (citation and punctuation omitted). Harris failed to show a *Brady* violation with respect to any records of a November 2012 allocution by Carter.

6. Finally, Harris argues that the trial court erred in allowing the State to present other-acts evidence regarding the subject of his prior armed robbery trial despite the State's failure to

28

comply with Georgia's reciprocal discovery statute, OCGA § 17-16-1 et seq.[13] We conclude that Harris waived any such argument and see no error.

In the weeks prior to trial, the defense apparently experienced some difficulty in obtaining certain evidence concerning Harris's 2011 Dougherty County armed robbery trial from the clerk's office. Harris filed a motion asking the trial court to (1) compel the clerk to release the evidence per a prior court order and (2) suppress any evidence from the prior trial based on the State's bad faith either in failing to provide requested documents or hindering the defense's attempts to obtain documents from the clerk.[14] At a hearing on the Friday before the Monday start of trial, Harris claimed that he had not received two digital or photographic exhibits and was unable to play two videos that he had received. The trial court denied the

---

[13] To the extent that Harris also purports to enumerate as error a *Brady* violation with respect to records from his prior trial, he has abandoned such a claim by failing to make any argument in support of it on appeal. See Supreme Court Rule 22 ("Any enumerated error not supported by argument or citation of authority in the brief shall be deemed abandoned.").

[14] The motion cited OCGA § 17-16-6, but not *Brady*.

request to suppress the evidence, saying that the State had not encouraged the clerk to disobey the court's prior order. The court also indicated that it would direct the clerk to produce any outstanding evidence immediately and invited the defense to request a continuance. The State noted that the two videos the defense claimed it had been unable to play had been played in court, and the trial court indicated that it would facilitate the defense's further review of those videos. At the close of the hearing, Harris's counsel indicated that she wanted an opportunity to review the evidence before it was presented at trial; the trial court responded, "Absolutely"; and Harris's counsel told the court, "We can forge ahead[.]" Before the State began its presentation of the prior testimony of Hunter, the missing witness to one of the 2009 Dougherty County robberies, Harris noted that he previously had objected on the ground that he had not received the transcript of that testimony in a timely fashion in compliance with the reciprocal discovery statute; the court said the objection was "noted."

OCGA § 17-16-4 (a) (3) (A) generally provides that the

30

prosecuting attorney must permit the defendant to inspect and copy those materials that the prosecutor intends to use at trial and that "are within the possession, custody, or control of the state or prosecution," and must do so no later than ten days before trial or as otherwise ordered by the court. OCGA § 17-16-6 provides that if the 10-day deadline is not met, the trial court can elect various remedies short of exclusion, including granting a continuance. "The State may be prohibited from introducing evidence that was not timely disclosed only upon a showing of both prejudice to the defendant and bad faith by the State." *Carson v. State*, 308 Ga. 761, 768 (5) (843 SE2d 421) (2020) (citation and punctuation omitted). We review for clear error the trial court's factual findings as to bad faith and prejudice. See *State v. Bryant*, 307 Ga. 850, 853 (1) (838 SE2d 855) (2020).

Harris complains that the State's "interference" with his attempts to access evidence from the prior trial "put [him] at a disadvantage in [his] preparation in this trial." But the trial court specifically found that the State did not encourage the clerk to

disobey the court's order that Harris be provided access to the relevant material, and he cannot show that the trial court's finding of a lack of bad faith in this respect was clearly erroneous. Moreover, the trial court invited Harris to move for a continuance based on his objections, but he declined to do so, saying instead that the trial could "forge ahead." He therefore has waived any objection to admission of the other-acts evidence based on any violation of the reciprocal discovery statute. See *Valentine v. State*, 293 Ga. 533, 536 (2) (748 SE2d 437) (2013) ("By failing to ask for more time to prepare for the testimony of the expert witness, [the appellant] waived any claim of error with respect to the failure of the trial court to give his lawyer more time.").

*Judgment affirmed. All the Justices concur.*